**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
**Sheldon L. Pollock**
**Lindsay S. Moilanen**
**Richard G. Primoff**
**Bennett Ellenbogen**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street**
**Suite 20-100**
**New York, NY 10004-2616**
**212-336-0148 (Primoff)**
**primoffr@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **COMPLAINT** |
| **Plaintiff,** | **24 Civ. 9494 (      )** |
| **-against-** | |
| **ERIC MCKENZIE COBB,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Eric McKenzie Cobb ("Cobb"), alleges as follows:

**SUMMARY**

1.      Cobb, a former investment adviser representative, engaged in a long-running and

fraudulent trade allocation scheme—commonly referred to as "cherry-picking"—from at least

approximately January 2019, and continuing to at least mid-April 2022 (the "Relevant Period")

in which he benefitted himself to the tune of approximately $170,000 in net illicit profits while

betraying his fiduciary obligations to his advisory clients, and causing them approximately $188,000 in aggregate losses.

2.     To carry out this scheme, Cobb engaged in frequent "block trading"—placing securities trade orders in one aggregated account, rather than directly in specific client accounts —and then waited at least one day after the trades were executed before allocating them between his client accounts on the one hand, and accounts held by him and his wife on the other hand.

3.     By waiting to allocate, Cobb could see whether the price of the securities he traded rose or fell after the trades were executed before deciding whether he would assign them to his accounts or to his clients' accounts.

4.     Cobb then disproportionately assigned the profitable trades to his account, and disproportionately allocated unprofitable trades to his clients' accounts.

5.     Cobb chose to concentrate his trading for his and his clients' accounts in securities that maximized his opportunity to profit from his cherry-picking scheme: Risky, volatile securities such as leveraged exchange-traded funds ("Leveraged ETFs") that sought to amplify the returns on underlying indices, as well as volatile, non-leveraged ETFs and other securities based on volatile commodities, such as precious metals and mining. For example, the Leveraged ETFs frequently had rapid and large price movements within a trading day, or from one trading day to the next. By concentrating his trading strategy on those investments, Cobb was able to grab quick profits from large price movements (or avoid large losses) in these securities by waiting a day to allocate them.

6.     But this speculative investment strategy was unsuitable and against the best interests of certain of his clients, whose financial profile, investment objectives and risk tolerance, as Cobb knew or recklessly or unreasonably disregarded, called for a far more

conservative investment strategy. As described below, these clients lost substantial amounts of the funds they had entrusted to Cobb during the Relevant Period.

## VIOLATIONS

7.      By virtue of the foregoing conduct and as alleged further herein, Cobb has violated Sections 17(a)(1) and (3) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77q(a)(1) and (3)), Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act') [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)], and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1)] and 80b-6(2)].

8.      Unless Cobb is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

9.      The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)], Exchange Act Section 21(d) [15 U.S.C. § 78u(d)], Exchange Act Section 21A(a) [15 U.S.C. § 78u-1(a)], and Advisers Act Sections 209(d) and 209(e) [15 U.S.C. §§ 80b-9(d) and 80b-9(e)].

10.      The Commission seeks a final judgment: (a) permanently enjoining Cobb from violating the federal securities laws and rules this Complaint alleges he has violated; (b) ordering Cobb to disgorge all ill-gotten gains he received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Cobb to pay a civil money penalty pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act

Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)]; and (d) permanently enjoining Cobb from directly or indirectly, acting as or being associated with any broker, dealer, or investment adviser, pursuant to Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and (5)], Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 209(d) of the Adviser Act [15 U.S.C. § 80b-9(d)].

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-14].

12.     Cobb, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

13.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-14]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails, or the facilities of a national securities exchange. At all relevant times, for example, Cobb was associated with a Commission-registered investment adviser, SeaCrest Wealth Management, Inc. ("SeaCrest"), whose principal place of business was located in the Southern District of New York in Purchase, New York ("the New York Office"). Cobb sent and received communications by email and telephone with the Chief Compliance Officer ("CCO") of SeaCrest who worked in the New York Office, in which he made materially misleading

statements, and omitted to state facts necessary to make his statements not misleading, in order to carry out his unlawful scheme.

## DEFENDANT

14.     **Cobb,** age 52, resides in Spartanburg, South Carolina. Cobb was associated with the Commission-registered investment adviser SeaCrest from approximately March 2016 to approximately August 1, 2022.

15.     In or about August 2022, SeaCrest terminated Cobb's association with it, because of its concerns he was engaged in cherry-picking, and investment strategies that were not suitable for his clients.

16.     Before Cobb was associated with SeaCrest, Cobb was employed at various securities firms since 1996. Immediately before Cobb worked at SeaCrest, he worked at a broker-dealer ("Firm A") from approximately 2014 to February 2016, and before that, another broker-dealer ("Firm B"), from 2009 to 2014.

17.     Firm A terminated Cobb's employment in February 2016 for violating rules of Firm A and of the Financial Industry Regulatory Authority ("FINRA") regarding communications with the public.

18.     Cobb was issued a Letter of Caution by FINRA for a similar issue at Firm B.

19.     Cobb previously held Series 7, 63, and 65 securities licenses, all of which are currently expired.

20.     In order to obtain these licenses from FINRA, Cobb had to pass examinations, including the General Securities Representative Exam (Series 7), the Uniform Securities Agent State Law Exam (Series 63), and the Uniform Investment Adviser Law Exam (Series 65).

21.     As an investment adviser representative at SeaCrest, Cobb was compensated for

providing investment advice and management to his clients on a discretionary basis, including by making trading decisions on when to buy and sell securities on their behalf.

22.    During the Commission's pre-filing investigation, Cobb repeatedly failed to respond to an investigative subpoena requiring his testimony and the production of documents dated June 23, 2023, and subsequent communications from the Commission.

23.    The Commission initiated a subpoena enforcement proceeding in April 2024, *SEC v. Cobb*, 24 Misc. 173 (S.D.N.Y.) (VEC) (the "Subpoena Enforcement Proceeding"), to compel his compliance with the Commission's subpoena.

24.    Cobb did not respond to the Commission's petition and did not appear for testimony in response to the Commission's subpoena until after the Court issued an order directing his compliance on May 7, 2024. *See* Subpoena Enforcement Proceeding, Dkt. No. 16.

25.    At the court-ordered testimony, Cobb admitted that he had received the Commission's subpoena in or around June 2023.

### RELEVANT ENTITIES

26.    **SeaCrest** is a Delaware limited liability company with its principal place of business the New York Office, and has been registered as an investment adviser with the Commission since May 12, 2008. SeaCrest conducts its investment advisory business through 26 offices around the United States. During the Relevant Period, it executed securities trades for its advisory clients through a broker-dealer ("Broker-Dealer").

27.    **Broker-Dealer** is a broker-dealer registered with the Commission, with its principal place of business in Westlake, Texas. Broker-Dealer acted as the custodian for the assets of clients who invested with Cobb and executed trades placed on their behalf by Cobb.

## FACTS

### I.    Background: Cobb Owed a Fiduciary Duty to His Clients

28.    During the Relevant Period, Cobb worked as an investment adviser representative at SeaCrest, and managed approximately 60 client accounts during the Relevant Period (the "Client Accounts").

29.    Cobb managed each of the Client Accounts on a discretionary basis, which means he had authority to trade securities for the Client Accounts without obtaining advance approval for such trades from his clients.

30.    During this same period, Cobb managed an account held jointly with his wife, and two additional accounts in his wife's name (collectively, the "Cobb Accounts"), in addition to several other accounts he managed on behalf of other family members.

31.    As an investment adviser representative servicing the Client Accounts, Cobb was responsible for choosing investment strategies for his clients and executing those strategies through purchasing and selling securities on their behalf.

32.    Cobb was compensated at SeaCrest with a percentage of the assets under his management, based on a fee paid by clients. This management fee was split between him and SeaCrest.

33.    As Cobb knew or recklessly disregarded, SeaCrest during the Relevant Period had a written compliance manual and a code of ethics with which he and other employees of SeaCrest were required to comply.

34.    SeaCrest required Cobb to review its written compliance manual and code of ethics at least annually. Cobb did so.

35.    During the Relevant Period, Cobb also attended SeaCrest's annual compliance

meetings during the Relevant Period, with the exception of 2022, when SeaCrest did not hold one.

36.     Among the written policies that Cobb reviewed and agreed to was one for "Trade Aggregation and Allocation," which covered situations where investment adviser representatives would place trades on an aggregated basis using a "block account."

37.     The Trade Aggregation and Allocation policy required that investment adviser representatives allocate such block trades "in a fair and equitable manner."

38.     SeaCrest's compliance manual further specified that in placing block trades, an investment adviser representative was not permitted to "favor any advisory Account over any other managed Account," and further required that the "relevant allocation methods are specified in writing *before* entering an aggregated order." (emphasis added).

39.     SeaCrest's compliance manual also had a policy entitled "Suitability."

40.     This Suitability policy stated that SeaCrest "has a fiduciary duty to provide investment advice to each Client that is suitable to that particular Client" and is responsible for making "a reasonable inquiry into the Client's investment objectives, financial situation, investment experience, and tolerance for risk."

41.     The compliance manual further required investment adviser representatives to ensure that suitability determinations remained current to the clients' current needs and objectives and that trades were placed consistent with those objectives.

42.     As Cobb also knew, or recklessly or unreasonably disregarded, SeaCrest filed Forms ADV with the Commission. These forms provide certain required information from registered investment advisers.

43.     During the Relevant Period, SeaCrest's Form ADV Part 2A ("Form ADV"), filed

with the Commission and made available to each of its clients, represented that its investment

adviser representatives were required as fiduciaries to "act in the best interest of its Clients,"

which "can be violated if personal trades are made with more advantageous terms than client

trades," and that "[a]t no time will Seacrest or any [investment adviser representative], transact in

any security to the detriment of the Client."

44.     In addition, SeaCrest's Form ADV stated with regard to suitability that

"[investment adviser representatives] will work with each client to determine their tolerance for

risk as part of the portfolio construction process" and further highlighted the risks associated

with investing in ETFs.

45.     As Cobb knew, or recklessly disregarded, investment adviser representatives owe

their clients fiduciary duties, which include the obligation to act in their clients' best interests, to

exercise the utmost good faith in dealing with their clients, to disclose to clients all material

facts, and to employ reasonable care to avoid misleading their clients.

**II.     Cobb Engaged in a Fraudulent Cherry-Picking Scheme.**

**A.  Cobb Disproportionately Allocated Profitable Trades to His
     Accounts By Engaging in Late Allocations of Block Trades.**

46.     Contrary to SeaCrest's written policies and its representations to its clients, and in

breach of his fiduciary duties to his advisory clients, Cobb, during the Relevant Period,

knowingly or recklessly engaged in a pattern and practice of favoring the Cobb Accounts over

the Client Accounts when allocating securities trades.

47.     As Cobb also knew, or recklessly disregarded, he profited from this scheme, at the

expense of his advisory clients.

48.     Cobb knowingly, or with reckless disregard, carried out this undisclosed scheme

by placing the vast majority of the dollars he invested for the Cobb Accounts and the Client

Accounts in trades executed by the Broker-Dealer in an aggregate, or "block" account (the "Block Account"), rather than trading directly and separately in each of the Client Accounts or the Cobb Accounts.

**1.    Cobb's Engaged in Cherry-Picking During the Relevant Period**.

49.    During the Relevant Period, Cobb used the Block Account to trade more than 86.5% (approximately $47.9 million) of the approximate $55.3 million he invested in the Cobb Accounts and Client Accounts, and only approximately 13.5% ($7.5 million) in direct trades he invested for the Cobb Accounts and Client Accounts.

50.    Cobb then frequently—indeed, in trades representing more than half of the dollars he invested during the Relevant Period—waited one or more days following the Broker-Dealer's execution of the trades before allocating those trades in the Block Account to the Client Accounts.

51.    In this way, Cobb created for himself the opportunity to see whether the trades he placed were profitable, or unprofitable, as of the time he allocated those trades between the Cobb Accounts and the Client Accounts.

52.    Cobb then disproportionately assigned "winning trades" (*i.e.*, trades where the price of the securities increased from time of execution to time of allocation) to the Cobb Accounts, while disproportionately assigning "losing trades" (*i.e.*, trades where the price of the securities decreased from time of execution to time of allocation) to the Client Accounts.

53.    Specifically, during the Relevant Period, of the 194 trades Cobb allocated to the Cobb Accounts, 147 were profitable at the time Cobb allocated them to the Cobb Accounts—a "win" rate of, approximately, more than 75%. But of the 5,537 trades Cobb allocated to the Client Accounts, only 2,378 were profitable at the time of allocation—a win rate, approximately,

of only 43%.

54.    On a dollar-weighted basis, Cobb's scheme of favoring his own interests over his clients' is even starker: During the Relevant Period, more than 90% of the dollars Cobb invested in the Cobb Accounts through the Block Account were profitable at the time he allocated them, while only approximately 43% Cobb allocated to the Client Accounts were profitable.[1]

55.    As a result, Cobb engineered a return on investments ("ROI") for the Cobb Accounts as of the time of allocation of 7.46%, compared to a negative return of -.22% for the Client Accounts during the Relevant Period.

56.    As a result of his cherry-picking scheme, Cobb obtained a total of more than $174,660 in profits for the Cobb Accounts measured at the time of allocation. Had he not engaged in his cherry-picking scheme and had the Cobb Accounts earned the average ROI earned across all accounts, the Cobb Accounts would have received only approximately $4,500 in profits.

57.    Cobb's scheme thus netted for the Cobb Accounts at least $170,110 in unlawful profits.

58.    The Client Accounts in the aggregate, meanwhile, suffered a net aggregate loss of approximately $188,133 from Cobb's cherry-picking scheme. Had Cobb not engaged in cherry-picking and had the Client Accounts earned the average ROI across all accounts, the Client Accounts would have received approximately $88,500 in profits as of the time of allocation.

---

[1]    A dollar-weighted win or loss rate takes into consideration the amount of the investment, by dividing the total money invested in "winning" trades by the total money invested.

     **2**.     **Cobb's Conduct Was Even More Blatant Before May 14, 2020, When He Was Notified His Conduct Was Being Monitored.**

59.     As discussed below (¶¶ 72-79), Cobb was notified at least by May 14, 2020 that the Broker-Dealer and the CCO of SeaCrest had become concerned he was engaging in unlawful cherry-picking to the detriment of his advisory clients, because of his frequent late allocations.

60.     Before May 14, 2020, Cobb's unlawful cherry-picking scheme was at its most egregious.

61.     From January 2, 2019 to May 13, 2020, Cobb allocated from the Block Account a total of approximately $1.9 million in trades to the Cobb Accounts and approximately $21.3 million in trades to the Client Accounts.

62.     These trades represented more than 99% of the dollars Cobb invested for the Cobb Accounts and the Client Accounts in this period of time, compared to less than 1% Cobb invested through direct trades.

63.     And while the ROI for the Cobb Accounts as of the time of allocation for the Relevant Period was 7.46%, their ROI for the period from January 2, 2019 to May 13, 2020 was even higher—8.7%, with a dollar-weighted win rate of more than 95%, compared to a dollar-weighted win rate of only approximately 42% for the Client Accounts.

64.     Indeed, of the approximate $170,110 Cobb obtained in net illicit profits from his cherry-picking scheme for the Relevant Period, Cobb obtained approximately $156,560 of those unlawful gains from January 2, 2019 through May 13, 2020.

65.     The following graph (Figure 1) demonstrates the disparate monthly returns as of time of allocation that Cobb engineered for the Cobb Accounts over his Client Accounts for the Relevant Period, and also demonstrates the change in those returns starting on or about May 14,

2020.

Figure 1



### B.  Cobb Acted Knowingly or Recklessly in Disfavoring His Clients

#### 1.  Cobb's Disproportionate Returns on
####     His Late-Allocated Trades Were Not the Result of Chance.

66.     Cobb acted knowingly or at least recklessly in cheating his advisory clients out of

trading profits at the time he allocated his block trades.

67.     As discussed above (¶ 56), Cobb's cherry-picking scheme resulted in the Cobb

Accounts receiving more than $174,660 in profits at the time of allocation during Relevant

Period, when they would have received only approximately $4,500 had they earned the average

ROI across all the accounts Cobb managed, Statistical tests find that the probability of such a

favorable outcome for the Cobb Accounts happening by chance are less than one in a million.

68.    Similarly, Cobb's scheme resulted in the Cobb Accounts receiving $166,103 in profits at the time of allocation during the period January 2, 2019 through May 13, 2020, when they would have received only $9,543 had they earned the average ROI across all accounts Cobb managed for this time period. Statistical tests find that the odds of such a favorable outcome for the Cobb Accounts for this time period happening by chance are less than three in a million.

### 2.    The Broker-Dealer Repeatedly Notified Cobb That He Was Late in Allocating Trades in the Block Account.

69.    On or about February 15, 2019, the Broker-Dealer electronically alerted Cobb's assistant at SeaCrest (the "Assistant") that Cobb had one or more unallocated trades in the Block Account. The Assistant then forwarded that alert to Cobb by email, to which Cobb responded, "Don't worry about checking my allocations, I'm on top of it…"

70.    On April 2 and 4, 2019, the Assistant forwarded two additional alerts from the Broker-Dealer, again advising that Cobb had one or more unallocated trades for Leveraged ETFs in the Block Account that had been executed no later than April 1 and 3, respectively. Cobb replied by email to the Assistant on April 4, 2019 that he "[t]ook care of it…."

71.    The Assistant continued to forward alerts from the Broker-Dealer regarding trades by Cobb in the Block Account that had not been allocated on at least eight more occasions during the Relevant Period: April 5, 2019, January 22, 2020, October 1, 2020, November 19, 2020, December 18, 2020, January 15, 2021, April 16, 2021, and December 31, 2021.

### 3.    Cobb Made False and Misleading Statements to SeaCrest's CCO to Continue His Fraudulent Scheme.

72.    Cobb also acted to deceive his supervisor, SeaCrest's CCO, when the Broker-Dealer alerted the CCO of its concerns that Cobb was engaging in cherry-picking, and the CCO

then raised these concerns with Cobb.

73.    In or around the first week of May 2020, the Broker-Dealer alerted the CCO, whose official work location at all relevant times was the New York Office, that Cobb was not allocating trades in the Block Account on a timely basis and was concerned that Cobb was treating his advisory clients unfairly by engaging in cherry-picking.

74.    The CCO then spoke with Cobb by telephone on May 4, 2020, and again on May 14, 2020, regarding the concerns raised by the Broker-Dealer, including its concerns Cobb was disfavoring his clients by his late allocations in the Block Account. During these conversations, Cobb knowingly, or with reckless disregard, falsely denied to the CCO that he was engaging in cherry-picking or otherwise disfavoring his client accounts.

75.    Cobb also knowingly, or with reckless disregard, sent the CCO false and misleading written statements in response to the CCO's inquiry, in which he falsely denied engaging in cherry-picking.

76.    On May 5, 2020, for example, Cobb sent the CCO an email in which he assured him that "[a]ll the trades are placed through the master account so everyone gets the same price of the trade."

77.    Cobb's email was false and misleading, because, as Cobb knew, or recklessly disregarded, his cherry-picking scheme did not involve Cobb selecting trades with better executions for himself (the straw man his email disingenuously purported to rebut), but rather by waiting to see whether a trade was profitable before choosing whether to take it or give it to a client—material facts he omitted from his email.

78.    After Cobb's second telephone conversation with the CCO on May 14, 2020, Cobb then sent a letter to the CCO by email on or about May 18, 2020. In this letter, Cobb

purported to explain certain block trades that were the subject of the Broker-Dealer's alert to SeaCrest.

79.     In the letter, Cobb acknowledged he delayed the allocation of his block trades, but he knowingly, or with reckless disregard, omitted any explanation of his disproportionate allocation of winning trades to the Cobb Accounts and, again, denied engaging in cherry-picking, falsely insisting that "I never intentionally put any of my clients at a disadvantage."

### 4.     Cobb Dramatically Reduced the Frequency of His Late Allocations Beginning on May 14, 2020.

80.     After Cobb became aware that both the Broker-Dealer and the CCO were looking into his cherry-picking scheme, he knowingly, or with reckless disregard, continued to engage in it, but did so less frequently and less obviously.

81.     As discussed above (¶ 62), before May 14, 2020, for example, more than 99% of the total amount invested by Cobb was executed through the Block Account. Commencing May 14, 2020, however, Cobb trades in the Block Account comprised only approximately 78% of the dollars Cobb invested for the Client Accounts, and approximately 56% of the dollars Cobb invested  for the Cobb Accounts.

82.     From May 14, 2020 to the end of the Relevant Period, Cobb also dramatically reduced the occasions in which he waited until the next day to allocate his trades in the Block Account: From January 2, 2019 to May 13, 2020, Cobb did so with more than 97% of the dollars he invested, but after May 13, 2020, he did so with only 8% of the dollars traded.

83.     The following graph (Figure 2) demonstrates the reduction in Cobb's late allocations commencing on or about May 14, 2020.

Figure 2



84.    Yet even during this latter period, Cobb knowingly, or with reckless disregard, still engaged in his cherry-picking scheme. He engineered for the Cobb Accounts an ROI of more than 2% as of the time he allocated the trades from the Block Account, compared to a negative rate of return of -.14% for the Client Accounts—a dollar-weighted win rate of more than 75% for the Cobb Accounts, and only approximately 45% for the Client Accounts.

85.    Statistical tests find that the probability of such a favorable outcome for the Cobb accounts happening by chance in this time period are less than one in 270.

86.    Indeed, on April 13, 2022, the CCO sent an email to Cobb in which he instructed him that "[g]oing forward, all block trades that you execute in your master account will be

followed up with an email to me disclosing the position and the allocation of shares of the trade in an excel spreadsheet."

87.    Further, the CCO instructed, "[t]his should be done on a timely basis and it is, of course, expected that all clients get equal and fair treatment on all block trades." The CCO's email also advised Cobb that Cobb not only needed to review SeaCrest's "compliance manual and code of ethics," but also that the CCO would review "pertinent sections" of them with Cobb—and that if Cobb "cease[d] to perform the above requirements then you will be subject to termination."

88.    Cobb responded by email that same day, assuring the CCO that he would follow the "new" procedures precisely as outlined in the CCO's email.

### C.  Cobb Heavily Traded Volatile Securities to Maximize His Opportunities to Profit From Cherry-Picking.

89.    Cobb chose an investment strategy heavily concentrated in volatile securities—Leveraged ETFs, and securities involving precious metals and mining industries. The volatility of these securities maximized Cobb's opportunity to grab quick profits between the time the trades were executed and the delayed time he chose to allocate them between the Cobb Accounts and the Client Accounts.

90.    Leveraged ETFs are exchange-traded funds and exchange-traded notes that use financial derivatives and debt, to amplify the returns of an underlying index or other assets it tracks, generally over the course of a single trading day. Unlike unleveraged ETFs, Leveraged ETFs will typically aim for a 2:1 or 3:1 ratio, thereby amplifying the potential for gains or losses that exceed the tracked index or assets.

91.    Leveraged ETFs generally reset their leverage on a daily basis, which means they adjust the leverage they employ to reset to the predetermined leverage ratio (*i.e.*, 2:1 or 3:1). For

this reason, the returns of such Leveraged ETFs are not intended to match the performance of the underlying indices for periods longer than one day.

92.    The use of leverage by these ETFs to amplify the returns of the underlying indices, as Cobb knew, or recklessly disregarded, made these investments even more volatile and risky than investments in the underlying indices to which they were benchmarked.

93.    During the Relevant Period, as set forth below in Table 1, of the approximate $48 million Cobb invested in the Block Account for the Cobb Accounts and the Client Accounts, Cobb invested approximately $39 million (more than 81%) in ten Leveraged ETFs and ETNs— and of this amount, more than $27 million were represented by just two such Leveraged ETFs in particular, Direxion Daily Gold Jr. Gold Miners Index Bull 2X (hereinafter referred to by its ticker symbol JNUG), and Proshares Ultra Vix Short Term Futures (hereinafter referred to by its ticker symbol UVXY).[2]

**Table 1**

| Name | Ticker | Leverage | Money invested Through The Block Account |
|------|--------|----------|------------------------------------------|
| Direxion Daily Jr. Gold Miners Index Bull 2X | JNUG | 2X | $14,145,556 |
| Proshares Ultra Vix Short Term Futures | UVXY | 1.5X | $12,894,906 |
| Velocityshares Daily 2x | TVIX | 2X | $3,602,313 |
| Velocityshares 3x Long Natural Gas | UGAZ | 3X | $2,820,555 |

---

[2]    Two of securities listed in Table 1, Microsectors Gold Miners 3x Leveraged ETN (GDXU), and Velocity Shares 3x Inverse Natural Gas ETN (DGAZ), are exchange-traded notes, not exchange-traded funds. As this distinction is not relevant to the allegations of the Complaint, these leveraged ETFs and ETNs are referred to hereinafter as Leveraged ETFs. Certain funds designated as "Bear" or "Inverse" funds are designed to move in the opposite direction of the underlying, benchmark index. Those funds are indicated with a negative sign before the leverage multiplier in Table 1.

| Proshares Ultrapro | TQQQ | 3X | $1,471,157 |
|---|---|---|---|
| Direxion Daily Junior Gold Miners IDx Bear 2X Shares | JDST | -2X | $1,427,310 |
| Microsectors Gold Miners 3x Leveraged ETN | GDXU | 3X | $916,693 |
| Direxion Daily S&P 500 Bear 3x | SPXS | -3X | $860,495 |
| Velocity Shares 3x Inverse Natural Gas ETN | DGAZ | -3X | $455,184 |
| Direxion Daily S&P Bull 3x | SPXL | 3X | $341,858 |

94.    JNUG, a Leveraged ETF that sought a 2:1 exposure to its benchmark "MVIS Global Junior Gold Miners Index" (the "JNUG Index")—meaning that it sought to double the return on the gold-mining index to which it was benchmarked—explicitly noted in its prospectuses and summary during the Relevant Period, for example, that its use of leverage will "have the effect of magnifying any differences in [its] correlation with the [underlying index]."

95.    JNUG, like other Leveraged ETFs, are not appropriate investments for a buy and hold strategy. As Cobb knew, or recklessly or unreasonably disregarded, JNUG warned in its prospectuses that it did "not seek to achieve its stated investment objective for a period of time different than a trading day." Further, they prominently noted JNUG was "intended to be used as [a] short-term trading vehicle[]."

96.    As Cobb also knew, or recklessly or unreasonably disregarded, JNUG's prospectuses also warned that it was designed to be used "only by sophisticated investors, such as traders and active investors employing dynamic strategies." Investors in JNUG, the

prospectuses warned, should, among other things, understand the "risks associated with the use of leverage" and the "consequences of seeking daily leveraged investment results."

97.     Among those risks and consequences were that "[f]or periods longer than a single day, [JNUG] will lose money if the Index's performance is flat, and it is possible that [JNUG] will lose money even if the Index's performance increases over a period longer than a single day. An investor could lose the full principal value of his/her investment within a single day."

98.     UVXY, similarly, sought to achieve 150% of the daily return of the S&P 500 VIX short-term futures index (itself a measure of market volatility), warned that it "should produce daily returns that are more volatile than that of its benchmark."

99.     UVXY's prospectuses, like JNUG's, warned that it presented "significant risks not applicable to other types of funds, including risks relating to investing in and seeking exposure to VIX futures contracts."

100.    As with JNUG, UVXY's prospectuses warned that investors should consider investing in UVXY only if "he or she understands the consequences of seeking daily investment results," among which (as with JNUG) was that an investor could "potentially lose the full principal value of his/her investment within a single day."

101.    Further, UVXY warned, like JNUG, that it was generally "intended to be used only for short-term time horizons," and investors "should actively manage and monitor their investments, as frequently as daily."

102.    The other Leveraged ETFs identified above in Table 1 provided similar disclosures regarding the risks and volatility of investing with them.

103.    Of the remaining amount of funds Cobb traded in the Block Account during the Relevant Period, five ETFs that concentrated in the precious metals and mining industries

accounted for almost $6 million and, with the $40 million in Leveraged ETFs, comprised more than 93% of all of the funds Cobb invested through the Block Account.

104.    The volatility and speculative nature of these investments were, as discussed in more detail below, unsuitable for at least certain of Cobb's clients, but they provided opportunities for Cobb to profit (or avoid losses) from his cherry-picking scheme, as demonstrated by the following representative examples of Cobb's fraudulent cherry-picking scheme.

### 1.    January 2, 2019 Purchase of UVXY

105.    In the morning of January 2, 2019, Cobb entered orders in the Block Account for the purchase of 3,500 shares of UVXY.

106.    As Cobb knew, or recklessly disregarded, that purchase was executed at $84.94.

107.    Cobb did not allocate that purchase, however, until the following morning, January 3, 2019, at which time, as Cobb knew, or recklessly disregarded, the price of UVXY had declined to $81.46, making that trade unprofitable.

108.    Cobb allocated all of the shares from that purchase to twelve of his Client Accounts, and none to the Cobb Accounts.

### 2.    February 21, 2020 Purchases of TVIX

109.    In the morning of February 21, 2020, Cobb placed purchase orders in the Block Account for 500 shares of the Leveraged ETF "Velocityshares Daily 2x", with the ticker symbol TVIX ("TVIX").

110.    As Cobb knew or recklessly disregarded, those purchases were executed at an average price of $45.45.

111.    Cobb did not allocate that purchase until the morning of February 24, 2020, the

following trading day. At that time, as Cobb knew or recklessly disregarded, the price of TVIX had increased to $60.06.

112.    Cobb did not allocate any of the shares of that profitable purchase to his Client Accounts, and instead allocated all of them to one of the Cobb Accounts.

### 3.    February 27, 2020 Purchase of JNUG

113.    In the morning of February 27, 2020, Cobb entered an order in the Block Account to purchase 400 shares JNUG, which, as Cobb knew, or recklessly disregarded, was executed that day at the price of $77.39. Later in the afternoon, Cobb sold 275 shares at a price of $65.52. The remaining 125 shares stayed on the books as an open position.

114.    Cobb did not allocate either the day trade or the open trade until the following morning, at which time the price of JNUG had declined to $54.05, meaning that the day trade lost approximately $11.87 per share, or $3,264 in total, while the open trade lost approximately $23.35 per share, or $2,919 in total, at that time.

115.    Cobb assigned all of the shares purchased in that trade to two of the Client Accounts, and none to the Cobb Accounts.

### 4.    March 12, 2020 Purchase of JNUG

116.    In the morning of March 12, 2020, Cobb entered orders in the Block Account to purchase 1,500 shares of JNUG. The average execution price of those purchases, as Cobb knew, or recklessly disregarded, was $23.27. Later in the afternoon, Cobb sold 125 shares at a price of $20.51.  The remaining 1,375 shares stayed on the books as an open position.

117.    Cobb, however, did not allocate those purchases, until the following morning, on March 13, 2020. At that time, the price of JNUG had declined significantly, to only $9.89, meaning that the open trade lost approximately $18,398, or $13.38 per share at that time, while

the day trade lost $345.

118.    Cobb allocated all of those 1,500 shares of JNUG to six of the Client Accounts, and none of them to the Cobb Accounts.

**5.    April 23-April 29, 2020 Purchases of UGAZ**

119.    From April 23, 2020 to April 29, 2020, Cobb entered orders in the Block Account to purchase a total of 3,00 shares of the Leveraged ETF "Velocityshares 3x Long Natural Gas," with a ticker symbol UGAZ ("UGAZ"), on four separate occasions. Cobb waited at least one day before allocating them between the Client Accounts and the Cobb Accounts, and for three of those four occasions, the price of UGAZ had declined at the time of allocation. Cobb assigned all of those unprofitable purchases to the Client Accounts. On the sole occasion where the price of UGAZ had increased since the purchase date, Cobb assigned half of the shares he purchased to one of the Cobb Accounts, and the remainder to one of his Client Accounts.

120.    Thus, in the morning of April 23, 2020, Cobb placed an order for 500 shares of UGAZ, which, as Cobb knew, or recklessly disregarded, was executed at a price of $34.03.

121.    Cobb did not allocate those shares until the following morning, on April 24, 2020, at which time the price of UGAZ had declined to $30.41.

122.    Cobb did not allocate any of the shares of that unprofitable trade to the Cobb Accounts, and instead allocated all of them to two of the Client Accounts.

123.    Shortly after he allocated that unprofitable trade to those Client Accounts on April 24, 2020, Cobb entered another purchase order for 700 shares of UGAZ in the Block Account, which, as Cobb knew, or recklessly disregarded, was executed at a price of $30.45.

124.    Cobb did not allocate that purchase, however, until April 27, 2020, at which time, as Cobb knew, or recklessly disregarded, the price of UGAZ had declined to $22.95.

125.    Cobb allocated all of the shares of that unprofitable trade to three of his Client Accounts, and none to the Cobb Accounts.

126.    Shortly after that allocation in the morning of April 27, Cobb placed another order in the Block Account, for 800 shares in UGAZ. As Cobb knew or recklessly disregarded, that trade was executed at $22.21.

127.    Cobb did not allocate that trade until the following morning, on April 28, 2020, at which time, as Cobb knew, or recklessly disregarded, the price of UGAZ had increased substantially, to $31.50.

128.    Cobb allocated 400 shares, half of that profitable trade, to one of the Cobb Accounts, and the remainder to three Client Accounts held by one of his clients, who was a fraternity brother of Cobb.

129.    Then, on the morning of the following day, April 29, 2020, Cobb entered purchase orders for 1,000 shares of UGAZ, which, as Cobb knew, or recklessly disregarded, were executed at $27.79.

130.    Cobb did not allocate those trades until the following morning, on April 30, at which time, as Cobb knew, or recklessly disregarded, the price of UGAZ had fallen to $26.18. Cobb assigned all of the shares from those trades to three of his Client Accounts, and none to the Cobb Accounts.

## III.    COBB'S RISKY INVESTMENT STRATEGY WAS UNSUITABLE FOR CERTAIN CLIENTS, WHO SUSTAINED SUBSTANTIAL LOSSES IN THEIR INVESTMENT ACCOUNTS

131.    Although Cobb's heavy investments in Leveraged ETFs, in addition to his other risky investments, maximized his opportunity to profit from cherry-picking, they were, as Cobb knew or recklessly or unreasonably disregarded, contrary to the best interests of at least three of

his clients, whose financial profile, objectives, and risk tolerance made these investments unsuitable.

132.    During the Relevant Period, these clients sustained substantial losses in the accounts they had entrusted to Cobb, who had discretionary authority to trade in them.

**A.    Cobb Placed Client A in Unsuitable Investments.**

133.    Client A is a public middle-school teacher, who became paralyzed and wheelchair-bound as a result of an automobile collision.

134.    Client A at all relevant times was not a sophisticated investor.

135.    In or about April 2016, Client A entrusted Cobb with the management of approximately $264,000 in proceeds Client A received from the settlement of a claim relating to the automobile collision.

136.    Before Client A became an advisory client of Cobb, he personally met with Cobb, at which time he told Cobb of his severe disability and that he required preservation of his settlement proceeds to pay for ongoing medical expenses.

137.    Client A also told Cobb he was not a sophisticated investor, that he was a middle school teacher and that he and his wife, a nurse, together earned less than $100,000 per year.

138.    Client A also disclosed to Cobb in account opening documents that he and his wife had an estimated net worth between $250,000-$500,000.

139.    Cobb knew of, or recklessly or unreasonably disregarded, Client A's medical condition, and the need for Client A to preserve the funds he was investing with him.

140.    Instead, during the Relevant Period, Cobb placed a large percentage of Client A's investment account (a joint account held with his wife) in the Leveraged ETFs described in paragraphs 89-103, above.

141.    During the Relevant Period, on average, Cobb invested approximately 37% of Client A's principal account (a joint account held with his wife) in Leveraged ETFs, and for certain months during the period amounted, those investments amounted to as much as 71%. Indeed, in 2019, 2020, 2021 and 2022, the average concentration in Client A's joint account in Leveraged ETFs amounted to approximately 57%, 37%, 34% and 24%, respectively.

142.    The remainder of the investments Cobb placed Client A's funds into consisted primarily of securities in precious metals, and gold and silver mining industries.

143.    By way of example, in January 2021, Cobb had invested 66% of Client A's main account in the Leveraged ETFs JNUG and UVXY; 14% in the "Amplify Junior Silver Mining Index ETF" (SILJ); and 17% in two mining company stocks, Pan American Silver Corp. (PAAS), and Hecla Mining Company (HL).

144.    Cobb's concentration of Client A's assets in these Leveraged ETFs, and in these metals and mining securities, as Cobb knew or recklessly or unreasonably disregarded, was unsuitable for Client A's financial profile, objectives and risk tolerance.

145.    Cobb, further, had no reasonable basis to conclude, from Client A's personal circumstances, that his investment strategy was suitable for Client A nor in his best interests.

146.    At no time, did Cobb explain to Client A the volatility and risks of these investments.

147.    Had Cobb explained the risks of the investments he was making to Client A, Client A would not have entrusted he management of his settlement proceeds to Cobb, as they were contrary to his expressed objectives for his portfolio, and his tolerance for risk.

148.    Cobb's unsuitable investment strategy generated sustained successive losses in 2020, 2021 and through August 2022 in Client A's joint account totaling more than $65,000,

even after a gain in 2019—and a net loss overall in Client A's account from June 2019 to August 2022 of more than $27,800.

**B.    Cobb Placed Client B in Unsuitable Investments.**

149.    Client B became an advisory client of Cobb in or around 2010, before Cobb began working at SeaCrest, and was an advisory client of Cobb and SeaCrest as of 2016.

150.    Client B is a teacher with an annual income of approximately $125,000 during the Relevant Period and at no time during the Relevant Period was a sophisticated investor.

151.    Client B moved her assets to SeaCrest when Cobb began working there and opened multiple accounts for Cobb to manage.

152.    At the time her accounts were assigned to Cobb at SeaCrest, Client B was approximately 46 years old, and intended to use her investment portfolio for her retirement, which came from the receipt of a settlement involving the death of her first husband.

153.    Client B's investment objectives during the Relevant Period were to grow and preserve her assets and accept only moderate risk.

154.    Cobb, however, improperly assigned an aggressive investment objective to Client B's accounts, which were, as Cobb knew, or recklessly or unreasonably disregarded, not suitable for Client B and not in her best interests.

155.    As of June 2019, Client B had invested a total of approximately $1,008,000 in the three main accounts Cobb was managing at SeaCrest. Client B's principal account held a balance as of June 1, 2019 of approximately $883,000, and the other two accounts had balances of approximately $76,953 and $47,305, respectively.

156.    Cobb, from at least June 2019 through July 2022, invested Client B's assets in these three accounts almost entirely in Leveraged ETFs, and mining and metals stocks.

157.    In Client B's largest account, Cobb had invested approximately, on average, 19% of Client B's assets in Leveraged ETFs from June 2019 through July 2022, with the remainder dominated by speculative mining and metals securities.

158.    In the other two accounts, Cobb invested, on average, approximately 42% and 45% of Client B's assets in Leveraged ETFs and the remainder, as with her other accounts, dominated by metals and mining securities.

159.    At no time did Cobb properly disclose to Client B the risks of investing in these speculative securities to Client B or ensure that she understood those risks.

160.    As a result of Cobb's unsuitable investment strategy, Client B sustained substantial losses from June 2019 through August 2022. From a starting value of approximately $1 million in Client B's three main accounts as of June 2019, Cobb's strategy, after gains in 2019 and 2020, generated successive losses in 2021 and 2022 of in Client B's main accounts amounting to more than $557,000, and a net loss of $153,000 that left these three accounts with a remaining value of only approximately $622,368.

### C.    Cobb Placed Client C in Unsuitable Investments.

161.    Client C became an advisory client of Cobb approximately sixteen years before Cobb began working at SeaCrest.

162.    At all relevant times, as Client C told Cobb and as he knew, or recklessly or unreasonably disregarded, Client C was not an experienced, knowledgeable or sophisticated investor.

163.    At the outset of Cobb's advisory relationship with Client C, Client C told Cobb that she wanted to invest a sum of approximately $400,000 with him, which she had received in a divorce settlement.

164.    Client C told Cobb at that time that she wanted to preserve the assets she had entrusted to him, with a secondary goal of capital growth, so that it would be available for her retirement, and that they be invested in a diversified portfolio of assets.

165.    Client C repeatedly told Cobb that these were her objectives, and that her risk tolerance was low, during the Relevant Period.

166.    Client C moved her assets to SeaCrest when Cobb started working there in 2016, at which time Client C was approximately 63 years old.

167.    At that time, Client C had an annual income of less than $100,000 and a total net worth of between $250,000 and $500,000.

168.    Contrary to Client C's instructions, and contrary to her personal circumstances, investment objections and risk profile, Cobb, from June 2019 to August 1, 2022, knowingly, recklessly or unreasonably invested Client C's assets in Leveraged ETFs and other speculative and volatile securities that were unsuitable and not in her best interests.

169.    Contrary to Client C's instructions, furthermore, Cobb improperly filled out a portion of the investment management agreement with Client C indicating that she had an "aggressive" investment profile—a profile that was at odds with Client C's repeated communications to Cobb and, as Cobb in any event knew, or recklessly or unreasonably disregarded, unsuitable for her, given her financial circumstances.

170.    As of June 2019, Client C held one account at SeaCrest that Cobb was managing, an individual retirement account ("IRA") with a value then of approximately $251,139, and in August 2019, she moved another IRA account to Cobb's management at SeaCrest, with a value at that time of $30,609.

171.    From then until August 2022, Cobb invested Client C's accounts in Leveraged ETFs, almost entirely in volatile and speculative securities such as Leveraged ETFs, and metals and mining stocks.

172.    In Client C's principal account, for example, Cobb had invested, on average during this period, 27% of her assets in Leveraged ETFs, with the remainder dominated by speculative metals and mining stocks.

173.    Similarly, in Client C's other account Cobb had invested, on average during this period, 35% of her assets in Leveraged ETFs, with the remainder dominated by speculative metals and mining stocks.

174.    Cobb never explained to Client C the riskiness and volatility of the Leveraged ETFs and other speculative securities he was investing her in, nor did he seek to ensure she understood those risks, or the consequences of those risks to her portfolio.

175.    Client C sustained substantial investment losses from Cobb's investment strategy. By the end of August 2022, her two accounts, after some gains in 2019 and 2020, sustained more than $245,000 in losses in 2021 and 2022, and more than $65,000 in net aggregate losses. These accounts, which Client C had intended to use to fund her retirement, had declined in value from approximately $282,000 to only approximately $150,000.

## V.    TOLLING AGREEMENTS

176.    Cobb entered into a tolling agreement with the Commission dated June 12, 2024, covering the period June 10, 2024 through September 9, 2024.

177.    Cobb entered into another tolling agreement with the Commission dated September 5, 2024, covering the period September 9, 2024 through December 9, 2024.

## FIRST CLAIM FOR RELIEF

### Violations of Securities Act Section 17(a)(1) and (3)

178.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 177.

179.    Defendant, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, and/or (2) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

180.    By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Section 17(a)(1) and (3) [15 U.S.C. § 77q(a)(1) and (3)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5(a) and (c) Thereunder

181.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 177.

182.    Defendant, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, and/or (ii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

183.    By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

### THIRD CLAIM FOR RELIEF
### Violations of Advisers Act Sections 206(1) and (2)

184.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 177.

185.    At all relevant times, Cobb was acting as an investment adviser as defined in Advisers Act Section 202(11) [15 U.S.C. § 80b-2(11)] and was associated with the registered investment adviser SeaCrest.

186.    Cobb, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly has: (i) knowingly or recklessly employed one or more devices, schemes, or artifices to defraud any client or prospective client, and/or (ii) knowingly, recklessly, or negligently engaged in one or more transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon any client or prospective client.

187.    By reason of the foregoing, Cobb, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Advisers Act Sections 206(1) and (2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Defendant and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or

indirectly, Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §§ 77q(a)(1) and (3)], Exchange Act Section 10(b) [15 U.S.C. §78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)] and Advisors Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)];

## II.

Permanently enjoining Cobb and his agents, servants, employees and attorneys and all persons in active concert or participation with him, and any entities he owns or controls, from, directly or indirectly, acting as or being associated with any broker, dealer, or investment adviser, provided, however, that this injunction shall not prevent Defendant from being a customer or client of a broker, dealer, or investment adviser;

## III.

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

## IV.

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Section 209 of the Advisers Act [15 U.S.C. § 80b-9]; and

## V.

Granting any other and further relief this Court may deem just and proper.

## JURY DEMAND

The Commission demands a trial by jury.

Dated: New York, New York
      December 12, 2024

By:    <u>s/Antonia M. Apps</u>

ANTONIA M. APPS
REGIONAL DIRECTOR
Sheldon L. Pollock
Lindsay S. Moilanen
Richard G. Primoff
Bennett Ellenbogen
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
212-336-0148 (Primoff)
primoffr@sec.gov